IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2018 Session

## STATE OF TENNESSEE v. AHMON WATKINS AND PETER DODSON, IV

**Appeal from the Circuit Court for Rutherford County**
**Nos. F-75627A, F-75627B David M. Bragg, Judge**

─────────────────────────────────

### No. M2017-01600-CCA-R3-CD

─────────────────────────────────

In a joint trial, a Rutherford County jury convicted Ahmon Watkins of two counts of aggravated rape, four counts of rape, and two counts of sexual battery, and Peter Dodson, IV, of one count of aggravated rape, one count of rape, and two counts of sexual battery. The trial court sentenced Defendant Watkins to an effective sentence of twenty years and Defendant Dodson to an effective sentence of twenty-five years. On appeal, Defendant Watkins and Defendant Dodson assert that: (1) the trial court erred when it did not grant a new trial based upon newly discovered evidence; (2) the trial court erred when it did not grant a new trial based upon the victim's false testimony; (3) the State committed prosecutorial misconduct during closing argument; (4) the trial court made improper "introductory comments" to prospective jurors during voir dire; (5) the trial court improperly excluded impeachment testimony; (6) the trial court failed to order the deposition of the victim; (7) the trial court erred when it gave jury instructions on the law before jury selection was complete; (8) the trial court improperly instructed the jury on reckless conduct; (9) the trial court improperly addressed a jury question during deliberations; (10) the defendants are entitled to relief based upon cumulative error; and (11) the evidence is insufficient to sustain the defendants' convictions. Defendant Watkins additionally raises issues related to sentencing. After review, we reverse for cumulative error and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and J. ROSS DYER, JJ., joined.

Thomas S. Santel, Jr. (on appeal), and Drew Justice (at trial), Murfreesboro, Tennessee, for the appellant, Ahmon Watkins.

Patrick T. McNally (on appeal), Nashville, Tennessee, and Russell N. Perkins (at trial), Murfreesboro, Tennessee, for the appellant, Peter Dodson, IV.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Jennings H. Jones, District Attorney General; and Sarah N. Davis and Matthew W. Westmoreland, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
## I. Facts

This case arises from the defendants' sexual interactions with the victim on the night of January 21, 2015, in Murfreesboro, Tennessee. A Rutherford County grand jury indicted Defendant Watkins and Defendant Dodson for six counts of aggravated rape and two counts of aggravated sexual battery.

### A. Trial and Sentencing

On the night of January 21, 2015, the victim went to the Campus Bar at 8:00 p.m. to drink beer after work. It was karaoke night and, after participating in karaoke, the victim returned to her seat at the bar. Over the course of the evening, the victim drank approximately four beers. As she sat at the bar, Defendant Watkins introduced himself, and they began talking. Defendant Watkins told the victim she was pretty and "push[ed] up against" her. She described their interaction as flirting, and she believed Defendant Watkins was "hitting on" her.

As they talked, Defendant Watkins introduced Defendant Dodson to the victim. Defendant Dodson spoke with the victim briefly before moving on to talk with other people at the bar. Defendant Watkins asked the victim to leave with him. She described Defendant Watkins as "persistent" and "pushy," but she agreed to leave the bar with him because she "felt like it." When Defendant Watkins and the victim left the bar together, Defendant Dodson stayed at the bar talking with other persons. As they walked out to the parking lot, Defendant Watkins guided the victim by her elbow to his vehicle. The victim recalled having "doubts" about leaving with Defendant Watkins but agreed that she did so "willingly." Once inside the car, Defendant Watkins began "groping" the victim. The victim told the Defendant "no," that she would not engage in sex in a car. Defendant Watkins drove to an Exxon gas station and went inside to buy condoms while the victim waited in the car. As they drove, Defendant Watkins continued to tell the victim that she was "pretty" and that she could sing well. The victim said that she was "flattered" by the compliments.

- 2 -

After buying the condoms, Defendant Watkins drove several businesses away from the gas station and parked in front of Grace Automotive. Defendant Watkins and the victim entered the business through a door that led into an office. Another door inside the office led into a "garage" area. The two entered into the garage area and began kissing and removing clothing. The victim voluntarily undressed "thinking that [she] and [Defendant Watkins] were going to have sex." Defendant Watkins sat the victim in a chair and then "was all over her."

While the victim and Defendant Watkins were engaged in "sex," Defendant Dodson entered the garage. Defendant Watkins stopped and walked over to Defendant Dodson. As the men talked, the victim tried to gather her clothing, feeling uncomfortable with the introduction of a third person. After a few minutes, both men moved toward her and began "rubbing up against [her], touching her." Defendant Dodson kissed the victim on her breast. The victim told the men that she did not want to participate in a threesome, but Defendant Watkins assured her that it would be "okay." The victim reiterated that she "don't share" and did not "want this." She was again told, "Don't worry. You'll like it." Defendant Watkins "flipped" the victim over and while standing behind the victim, instructed her to "suck [Defendant Dodson's] cock." Defendant Dodson, who was now seated in the chair in front of the victim, pulled out his penis. Defendant Watkins pushed the victim's head into Defendant Dodson's crotch while pulling her hair and repeated that the victim was to "suck [Defendant Dodson's] penis." Feeling fearful and that she had no choice, the victim performed fellatio on Defendant Dodson while Defendant Watkins penetrated the victim's vagina from behind with his penis.

While standing behind the victim, Defendant Watkins also anally penetrated the victim with his penis while holding the victim's arm back, "kind of like pinning [her]." The victim did not normally engage in anal sex and had not consented to it. She told Defendant Watkins that "it hurt." During these interactions, Defendant Watkins "hit" the victim on her buttocks. As the victim was bent over Defendant Dodson, she heard Defendant Watkins say, "heads up," so she turned her head toward Defendant Watkins. As she turned, Defendant Watkins slapped the side of the victim's face causing a nose bleed. The victim was "really scared" and when she turned her head back toward Defendant Dodson, who was still seated in front of her, he told her that her nose was bleeding. Defendant Dodson, angry that the victim had bled on his new sneakers, backed away saying that the victim was "too bloody" to continue. The victim attempted to push Defendant Watkins off of her and, in the process, kicked "someone's" cell phone, propelling the phone "off to the side." The victim said that Defendant Dodson "got very angry," asking why she had "do[ne] that," and the victim responded that she was trying to push Defendant Watkins off of her. The victim had seen a light, "like a flash," and assumed the defendants were filming the acts. She said it appeared that Defendant Dodson was the one holding the phone.

- 3 -

The victim cleaned her face in the bathroom and then returned to the garage area and dressed. Defendant Watkins drove the victim back to the Campus Bar. During the drive, Defendant Watkins, who is black, told the victim that he was married and advised the victim that if she saw him in public with "another white woman" not to speak to him. The victim testified that this upset her because she would not have left the bar with Defendant Watkins had she known he was married. The victim described Defendant Watkins's demeanor during the incident at the garage as "aggressive," but on the return drive to the Campus Bar, she said he was "[v]ery sweet, mellow." She exited Defendant Watkins's vehicle in the bar parking lot and went inside the bar. The victim went to the bathroom to wash her face again because she was still bleeding. She then asked the bartender for the Murfreesboro Police Department phone number. When the bartender refused, the victim went outside and called 911.

Initially, the victim told the 911 operator that she had been raped in a car. She explained that she did so because she was scared, confused, and she wanted someone to help her. She said that, although the rapes occurred in the garage, the incident began with Defendant Watkins groping her in the car. Upon police arrival, the victim vomited multiple times due to fear and stress. She was transported to St. Thomas Murfreesboro where she underwent a sexual assault examination. She told the nurse practitioner treating her that Defendant Watkins and Defendant Dodson had raped her in a garage but that she did not know their names. The victim testified that, since these events, she had discussed the rapes in therapy and struggled with sleeplessness and anxiety. She further identified photographs of her injuries, including a bruise on her hand and a handprint on her buttock. The photographs were taken as part of the sexual assault examination. She stated that she had experienced pain from irritation caused by the anal penetration.

Shonda Davenport, a bartender at the Campus Pub, testified that on Wednesday and Saturday nights, the bar held karaoke nights. Ms. Davenport recalled that one night a patron, later identified as the victim, approached her asking if Ms. Davenport would call the police because the victim had been raped. The bar was "very, very busy" due to karaoke night, so Ms. Davenport directed the victim to the doorman for assistance. Ms. Davenport had seen the defendants in the bar that night but did not serve them any alcohol.

Early on the morning of January 21, 2015, Jacob Lamb, a Murfreesboro Police Department ("MPD") officer, responded to a call about a possible rape at the Campus Pub. The phone call to 911 was placed at around 1:30 a.m., and Officer Lamb, who was in close proximity, arrived within minutes of the call. When he arrived, he met with the victim, who, based on his experience, did not appear intoxicated. Immediately upon his arrival the victim, who was visibly shaken, began to "stress throw[ ] up." Based upon the

- 4 -

victim's emotional state, Officer Lamb seated the victim in the back of his patrol car where she provided a brief description of the suspects.

Diana Thomas testified as an expert in forensic sexual assault examination. Ms. Thomas, a sexual assault nurse examiner, performed a "rape kit" on the victim and prepared a report of the exam. The victim arrived at the hospital at 2:09 a.m., and the exam was performed at 3:50 a.m. Although the victim reported having drunk beer during the previous evening, Ms. Thomas did not detect any intoxication. Ms. Thomas described the victim as "alert," "oriented, and tearful." The victim reported penetration to her mouth, vagina, and anus and the involvement of more than one assailant. Ms. Thomas observed a mark on the victim's hand and a "pattern bruise" on the victim's buttocks consistent with the victim's description of the incident. Photographs of these injuries were introduced into evidence. During the pelvic exam, Ms. Thomas found both external and internal injuries. She observed an abrasion to the apex of the labia minora caused by friction or blunt force trauma and redness on the cervix, which is normally caused by penetration. During the examination, Ms. Thomas observed bleeding in the victim's rectum area caused by a "tear to a skin tag on a hemorrhoid." Ms. Thomas collected swabs taken from the victim's mouth, breasts, vagina, cervix, and rectum based upon the victim's description of the incident. The victim's tank top, bra, and socks worn that night all had blood on them.

Laura Boos, a Tennessee Bureau of Investigation ("TBI") Special Agent Forensic Scientist, testified as an expert witness in the field of forensic biology. Agent Boos tested swabs and clothing provided in this case. The items submitted included oral swabs from both defendants, and oral, vaginal, cervical, and breast swabs and clothing items from the victim. The presence of sperm was found on the victim's vaginal swab. Further analysis of the sperm revealed genetic material from at least three individuals with the major contributor matching the victim's DNA profile. One of the partial minor contributors was consistent with Defendant Watkins and the other limited contributor was "inconclusive" as to Defendant Dodson. "Inconclusive" indicated that Defendant Dodson could neither be included nor excluded as a contributor of the sample.

Special Agent Boos determined that there was also sperm on the victim's cervical swab but due to degraded DNA, the result was inconclusive. The breast swab was tested for saliva and the presence of alpha-amylase was detected. DNA testing revealed a mixture of genetic material from the victim and Defendant Dodson. Agent Boos tested sperm cells found on the inside crotch area of the victim's pants. The DNA found in the sperm fraction was from two individuals; the major contributor profile matched Defendant Watkins's profile. The minor contributor was inconclusive as to the victim, and Defendant Dodson was excluded as a contributor.

Agent Boos obtained a DNA profile from a blood stain on the back of the victim's pants. The DNA profile was a mixture of at least two individuals; the major contributor was the victim, and the minor contributor was Defendant Watkins as to the sperm fraction in this sample. Defendant Dodson was excluded as a contributor to the mixture. Agent Boos found sperm on the inside of the victim's tank top, and the DNA profile of the sperm matched Defendant Watkins's profile. A blood sample taken from the back of the victim's tank top contained a DNA profile consistent with the victim's profile.

Tommy Roberts, an MPD officer, spoke with the victim and obtained a description of the suspects and the garage where she had been taken. Based upon this information, he began canvassing automotive stores on Northwest Broad. He saw Defendant Watkins standing outside a car dealership and thought he looked like the man in the still photograph obtained from the Campus Pub surveillance video. Investigator Roberts approached Defendant Watkins, introduced himself, and showed Defendant Watkins the still photograph. Defendant Watkins identified himself as the man in the photograph. Investigator Roberts asked Defendant Watkins the name of the "other man" at the bar, and the Defendant identified Defendant Dodson.

During the course of the investigation Investigator Roberts obtained surveillance video footage from the Campus Bar and the Florence Station Market. He also subpoenaed Defendant Watkins's cell phone ("the Watkins phone") records and Defendant Dodson's cell phone ("the Dodson phone") records. Investigator Roberts created a photographic line-up containing photographs of the defendants and showed the line-ups to the victim. She identified both Defendant Watkins and Defendant Dodson in the respective photographic line-ups.

Jennifer West, an MPD officer, worked in the Forensic Services Unit processing cell phones, memory cards, and SIM cards, gathering the data on a device and compiling the data in a format that is "easy for the detective to read." Detective West typically used several different tools, including Cellebrite and Lantern, to extract and analyze data. Detective West could sometimes extract deleted data from a phone; however, in this case, she was unable to do so. At the time of her extraction, the only extraction available based upon the software was a "logical extraction." A logical extraction is "only what you can visibly see on the device." Detective West "usually" recommended to the officer working on a case that they subpoena the cell phone records in order to compare the extraction with the information provided by the cell phone company to determine if information has been deleted.

Detective West was presented with two cell phones related to this case, the Watkins phone and the Dodson phone. When Detective West performed the extractions on the two phones, she was specifically looking for video or photos taken on the night of

January 21, 2015, and into the morning hours of January 22, 2015, or any phone calls or text messages between the two phones. Detective West did not discover any photographs or videos based upon her limited extraction.

The results from the logical extraction, however, did show that there were no text messages between the Watkins phone and the Dodson phone on the night of January 21 or early in the morning on January 22, 2015. In reviewing the Verizon billing records for the Watkins phone, for the time period from 7:00 a.m., January 21, 2015, to 8:20 a.m. on January 22, 2015, there were eight phone calls between the two cell phones between 11:52 P.M. and 1:17 A.M. Detective West testified that the eight calls shown on the billing records between the two phones had been deleted from the Watkins phone prior to her extraction. In comparing the two phone records, the phone calls to or from the Dodson phone were the only phone calls that were deleted from the Watkins phone. Phone records showed phone calls to the Dodson phone at various dates and times; the only ones deleted from the Watkins phone were the calls placed during the specified time period.

Detective West testified that she was "advised that there was possibly a video." Neither of her extractions provided "that information," so she advised Detective Roberts to contact the TBI to see what assistance they could provide.

Nick Christian, a TBI special agent, conducted a digital forensic examination of the Dodson phone. Agent Christian commonly used the software Cellebrite to extract cell phone data due to its effectiveness and the fact that most district attorneys are familiar with the reporting format for this software. Additionally, the TBI had access to advanced extraction technology such as "JTAG," "a chip-off procedure" that allowed retrieval of deleted data. Agent Christian performed a chip-off extraction on the Dodson phone. When performing a chip-off extraction, if deleted data has been "overwritten," the procedure will not recover that data.

Specifically, Agent Christian was looking for deleted files containing video or photographs that had not been overwritten. Agent Christian identified the CD he had created and given to the State containing the cell phone extraction. Based upon the extraction, Agent Christian found that all calls on the Dodson phone made prior to January 25, 2015 had been deleted. Agent Christian was looking for videos or photos taken during the late hours of January 21, 2015, to the early morning hours of January 22, 2015. Agent Christian was unable to recover the actual video or pictures but did find remnants of two files that were created during that timeframe. He found that a video had been taken at 12:36 a.m. on January 22, 2015. A photograph was taken two minutes later at 12:38 a.m. Both images had been deleted and overwritten so were unrecoverable. Following his examination, at defense counsel's request, Agent Christian transferred an

exact copy of the extracted data to a private company, LogicForce, for further examination.

The defense presented Brian Fengler, a physician who met with the victim following the alleged rapes. On January 21, 2015, Dr. Fengler was working at St. Thomas Rutherford Hospital Emergency Department as an emergency physician. During the early morning hours of January 22, 2015, Dr. Fengler met with the victim, who reported that she had been raped. His summary in the medical records indicated that the victim told him that she was coerced by two men to leave the bar. They took her to their car and "forcibly started" having vaginal intercourse with the victim in the car. They drove to a place with "a lot of cars in the lot" and took her into an office where they forced her into intercourse. She reported penetration to her mouth, vagina, and rectum. She attempted to fight back and, at one point, was punched in the face/nose. The assailants drove the victim back to the bar and left her there.

Kathy Tomlinson, Defendant Watkins's mother-in-law, testified that Defendant Watkins is a peaceful person. She had witnessed Defendant Watkins "raise his voice" but she had never seen him "be violent." Corwin Moses grew up with Defendant Watkins and testified that he was a "peaceful person." Jamie McCaskill, Defendant Watkins's wife's cousin, also testified that the Defendant was "peaceful."

After hearing this evidence, the jury found Defendant Watkins guilty of four counts of rape, two counts of aggravated rape, and two counts of sexual battery. The jury found Defendant Dodson guilty of one count of rape, one count of aggravated rape, two counts of sexual battery and not guilty as to the four remaining counts. After a sentencing hearing, the trial court found that Defendant Watkins was the leader in the commission of an offense involving two or more actors and gave slight consideration to the enhancement factor that the rape was committed for pleasure or excitement. The trial court also considered mitigating factors but found that none applied. The trial court then merged the appropriate convictions and, for Defendant Watkins, imposed an effective sentence of twenty years as a Range I offender in the Department of Correction. The trial court imposed, for Defendant Dodson, an effective sentence of twenty-five years as a Range II, multiple offender, in the Tennessee Department of Correction.

**B. Motion for New Trial Hearing**

Initially, the parties stipulated that the first exhibit would be a courthouse hallway surveillance recording taken during the trial. Next, Defendant Dodson's attorney announced that he wanted to call the victim as his first witness but that she was not present. The State asked if she was subpoenaed, and Defendant Dodson's attorney responded:

She was [subpoenaed] subsequent to the Court quashing the deposition. Two subpoenas were issued. They were not served. We didn't know if she would be here this morning, Your Honor. That was the reason for not calling her.

Based upon our review of the record, we gather that the State had agreed to allow defense counsel to depose the victim in preparation for the motion for new trial hearing but later revoked this agreement when the defense would not agree to limit their questioning to the issues raised in the motion for new trial. The State filed a motion to limit the scope of the deposition of the victim. At a hearing on the motion, the trial court declined to order the parties to conduct a deposition. There are two unserved subpoenas for previous settings but no subpoena in the appellate record for the date the motion for new trial was actually heard.

The defense called Nick Christian, who testified about his extraction from the Dodson phone. He confirmed that he used Cellebrite to extract the available data from the phone but used "another tool that comes with the chip-off extraction software" for the "physical extraction." Agent Christian identified two reports that he prepared for this case. Agent Christian said that he was asked to look for specific images and videos on a specific date and time or text messages between Dodson's phone and Watkins' phone. In his initial report, dated September 9, 2015, he was unable to find the requested images or text messages between the specified devices. He then learned that the first extraction was incomplete, so he "redid" the extraction and obtained the entire sixteen gigabytes from the chip. He conducted the second chip-off extraction on September 29, 2015. In a supplemental report, Agent Christian indicated that there was a video and a photograph taken during the specified date and times that was subsequently deleted. He was unable to recover the image or the video at that time.

Agent Christian testified that he was contacted by both the State and Defendant Watkins's attorney, Mr. Justice, regarding the extracted data. He was instructed to give the extraction data to David McWhirt with LogicForce, a private digital forensics company. Agent Christian said that he knew Mr. McWhirt, who had formerly worked for the Department of Defense. He confirmed that Mr. McWhirt had received similar training to Agent Christian in forensic work. Agent Christian told the State that LogicForce "had the level of expertise" needed to review and interpret the information. Agent Christian's notes indicated that Mr. Justice contacted him on October 27, 2015, requesting that LogicForce examine the extraction. Agent Christian spoke with Mr. McWhirt and told him about the second extraction and that he had not completed the supplemental report yet. According to Agent Christian, Mr. McWhirt understood that he would only receive the second, complete, extraction from the chip. Agent Christian said

that he released the forensic image to Mr. McWhirt at TBI Headquarters on November 3, 2015.

Following the trial, the State contacted Agent Christian saying, "there actually were images of the incident." Agent Christian then expanded his search and reviewed the data again with the additional information provided by the State and he found images. Agent Christian explained that no one was able to find the photos because there was no date associated with the photos and they were not the original photos or video but "thumbnails" of the original photos. Agent Christian testified that, given the search parameters and because the images did not have any metadata associated with them, he would have never found the images.

Agent Christian testified at the defendants' trial on October 5, 2016, and he had provided the defense with the entire extraction almost a year earlier on November 3, 2015. Agent Christian testified that, when he expanded his search, he recovered thousands of images, "[p]ornographic mostly." Out of the thousands of images, four were related to the victim. Agent Christian confirmed that the State made everything they had available to the defense.

Drew Justice, Defendant Watkins's attorney, testified that Defendant Watkins told him that there was a video recording of consensual sex taken on Defendant Dodson's phone the night of the alleged rape. He received the first set of discovery in this case in June 2015, shortly after Defendant Watkins was indicted. After receiving the discovery, the State, Mr. Justice, and Defendant Dodson's attorney, Mr. Perkins, had numerous discussions about potential video or photographs related to the incident. All parties were interested in finding the images if possible. After the MPD had conducted an extraction, the State sent Defendant Dodson's cell phone to the TBI for additional analysis. Mr. Justice agreed that the State notified him once the TBI had completed the first extraction of Defendant Dodson's cell phone and provided him with the first extraction.

Mr. Justice testified that he told the State that he wanted someone from LogicForce to conduct an extraction for him because he did not "trust the TBI." Despite an October 27, 2015 email stating that the TBI analysis was "on-going," Mr. Justice claimed that he was unaware of the second extraction and the supplemental report. The State introduced a November 3, 2015 email from Mr. McWhirt, Defendant Watkins's expert, to Mr. Justice stating, "Regarding the Ahmon Watkins matter, I wanted to bring to your attention that SA Nicholas Christian from TBI released to me the extraction file from the Samsung phone." Mr. Justice maintained that he was still unaware of the final extraction and added that he never had any intention of looking for photographs even had he had the final extraction. Mr. Justice instructed Mr. McWhirt to review the extraction specifically for video based upon his client's assertions. Mr. Justice conceded that the

photographs at issue were on the extraction given to Mr. McWhirt. He argued, however, that it was extremely difficult to find the thumbnail photographs. Mr. Justice agreed that, in April 2016, the State filed with the trial court written discovery indicating that there were two CDs from the TBI. This filing was in addition to what Mr. Justice had already been given in April 2016. Mr. Justice acknowledged that the written discovery indicated that there were five CD's (three from the MPD and two from the TBI), and he confirmed that he had received five CD's. He stated that one of the two TBI CDs contained the September 9 report and the other he "couldn't view." Mr. Justice also agreed that he did not object to the State's references to the final extraction at trial.

Following the trial, Mr. Justice attempted to view the CD with the supplemental report introduced at trial but due to a crack in the CD, he was unable to view it. He then contacted the State requesting the CD and received it eight days after the trial. He reviewed all the photographs and, after close to two hours, found four photographs involving the victim. Mr. Justice said that, in the photographs, the victim was holding what Mr. Justice believed to be Defendant Watkins's penis in her left hand. Mr. Justice stated that the victim was either "sucking his penis or licking his penis" while holding her hand over her "own groin area." He said that the photographs do not display "any distress." He said he would have used the photographs at trial to argue that the sex in question was consensual. He further asserted that because the photographs were recovered from the Dodson phone, Defendant Dodson had to have taken the photographs, thereby undermining the victim's claim that she revoked her consent after Defendant Dodson arrived.

Mr. Justice recalled that, during his cross-examination of the victim at trial, the victim "essentially acknowledge[d] that [Defendant] Dodson never even had sex with her." Mr. Justice testified that the trial court then took a lunch break, after advising the victim not to discuss her trial testimony with anyone. When court reconvened following lunch, Mr. Justice believed that the victim "flip[ped] her story," claiming that both men had sex with her. Mr. Justice recalled that Mr. Perkins leaned over during the redirect and told Mr. Justice, "looks like they got to her during the lunch break." Mr. Justice was surprised by the accusation against the State and suggested that it did not occur to him because he is "more naïve." Nonetheless, he questioned the victim on recross about any discussions as follows:

Mr. Justice:      [Victim], during the lunch hour that we took a couple of hours ago after you got done - - after I got done talking to you the last time, did anyone come up to you to talk about your testimony?

Victim:      No.

- 11 -

Mr. Justice:      Did you talk to anyone at the D.A.'s office?

Victim:           No.

Mr. Justice:      Anyone from the D.A.'s office?

Victim:           No.

Based upon his concerns about possible coaching of the victim, Mr. Justice obtained courthouse hallway surveillance footage for the time at issue. The video shows the victim and two assistant district attorneys standing and talking waiting for the elevator. There is no audio to the recording. According to Mr. Justice, it appears that the victim is saying "I am trying" at some point, evidencing that the State is attempting to alter the victim's testimony. This conversation lasted for just under two minutes.

About the TBI's second extraction, Mr. Justice agreed that he worked with Defendant Dodson's attorney in preparation for trial. Specifically, he agreed that he asked Mr. Perkins to see all of the CDs given to him related to the trial and that one of those CDs was the report for the second extraction. While searching the court file following the trial to check on the CD, Mr. Justice found a jury note. Mr. Justice was unaware that the jury had submitted any questions to the trial court.

Following the proof, the trial court denied the defendants' motion for new trial.

## II. Analysis

On appeal, Defendant Watkins and Defendant Dodson assert that they are entitled to a new trial on the basis of: (1) the photographs from the second data extraction found after the trial; and (2) video footage of the victim and the prosecutor at trial talking in the hallway during a lunch break. The defendants also assert that: (3) the State committed prosecutorial misconduct during closing argument; (4) the trial court made improper "introductory comments" to prospective jurors during voir dire; (5) the trial court implemented an improper procedure for the introduction of the victim's prior inconsistent statements; (6) the trial court did not allow the victim's deposition to be taken; (7) the trial court erred in giving jury instructions on the law before jury selection was complete; (8) the trial court improperly instructed the jury on reckless conduct; (9) the trial court improperly addressed a jury's note during deliberations; (10) cumulative error; and (11) the evidence is insufficient to sustain the defendants' convictions. Defendant Watkins additionally raises issues related to sentencing.

## A. Photographs from the Second Data Extraction
### 1. Newly Discovered Evidence

The defendants contend that the photographs from the second extraction constitute newly discovered evidence. A new trial on the basis of newly discovered evidence should be granted in cases where: (1) the defendant has been reasonably diligent in obtaining evidence; (2) the materiality of the new evidence is apparent; and (3) the evidence is likely to change the result of the trial. *State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993). In order to be entitled to a new trial based on newly discovered evidence, a defendant must demonstrate that all three prongs of the test have been met. *See State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994). In order to meet "reasonable diligence" a defendant must demonstrate that neither the defendant nor defense counsel had knowledge of the alleged newly discovered evidence prior to trial. *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing *Jones v. State*, 452 S.W.2d 365, 367 (Tenn. Crim. App. 1970)). The decision to grant or deny a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge. *Caldwell*, 977 S.W.2d at 117. Accordingly, our standard of review is abuse of discretion. *See State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

The defendants contend that the four thumbnail photographs found in the extraction data from Defendant Dodson's phone constitute newly discovered evidence warranting a new trial. The State responds that the photographs are not "newly discovered evidence" because both defense attorneys and the defense expert possessed the extraction data well in advance of trial and that the defendants failed to exercise "reasonable diligence" in discovering the photographs. Alternatively, the State argues that the photographs have little impeachment value and thus "the general rule that evidence that only 'contracts or attempts to impeach' witness testimony" is not sufficient to entitle a defendant to a new trial. Citing *State v. Sheffield*, 676 S.W.2d 542, 554 (Tenn. 1984).

After hearing the evidence at the motion for new trial hearing, the trial court made the following findings as to this issue:

> The [] issue as to the newly discovered evidence of photographs of the victim appearing to engage in consensual sexual acts with a Defendant. And that concerned the Court when it initially read it, because it appeared to allege that the State had withheld evidence. However, a review of the file and the testimony today shows that the State transmitted that evidence to the Defense and the Defense's expert.

Further, the State filed its notice of discovery along with the discovery in the court file well in advance of the trial. And based on comments made in Mr. Justice's testimony, apparently Mr. Perkins had a copy of the disk. The Court didn't have any problem finding a copy of the disk. And certainly find that the notice of discovery filed by the State in April lists two C.D.'s.

Further Mr. Justice's testimony, while asserting to the Court he did not receive the second extraction, he acknowledged that his expert received the second extraction. He also acknowledged he had an additional disk that was not functional. I'm not really sure why that disk - - and it was not explored why Mr. Justice did not go back to the State to get that disk reissued. So, the Court finds that the Defendants have not successfully raised an issue with that. Because it appears that the information that they allege was newly discovered was not newly discovered, but was available to the Defendant[s] prior to trial.

The trial court concluded that the defendants had not exercised reasonable diligence. The defendants must show that the newly discovered evidence could not have been obtained before trial by the exercise of reasonable diligence on the part of either the defendants or their trial counsel. *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007). This requirement is ultimately fatal to the defendants' claim. As the defendants both discuss in their appellate briefs, the State disclosed the existence of the TBI report in its discovery response and provided both attorneys and the defense expert with the data. Therefore, any evidence contained in the data did not constitute "newly discovered evidence." *Id*.

When the trial court has denied a motion for new trial based upon newly discovered evidence, that decision may not be disturbed on appeal unless there is an abuse of discretion. *State v. O'Guinn*, 641 S.W.2d 894 (Tenn. Crim. App. 1982). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In our view, there has been no abuse of discretion in this instance. While the evidence is clearly material, the trial court determined that the defendants did not exercise reasonable diligence prior to trial to discover the evidence. We conclude that the trial court did not abuse its discretion. For this reason, this court must conclude that the issue is without merit.

## 2. Alleged Brady Violation

Defendant Watkins alleges that the State wrongfully suppressed the four photographs from the extraction. In *Brady v. Maryland*, the United States Supreme Court held, "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The State does not have an obligation to disclose information that is not in the possession or control of the State. *Id*. (citing *Banks v. State*, 556 S.W.2d 88, 90 (1977)). A defendant must prove the following four prerequisites in order to establish a violation of due process under *Brady*:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant must prove these due process violation prerequisites by a preponderance of the evidence. *Id*. (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

The trial court found that the State had not suppressed the data extraction.

> [A] review of the file and the testimony [at the motion hearing] shows that the State transmitted that evidence to the Defense and the Defense's expert.
>
> Further, the State filed its notice of discovery along with the discovery in the court file well in advance of the trial. And based on comments made in Mr. Justice's testimony, apparently Mr. Perkins had a copy of the disk. The Court didn't have any problem finding a copy of the disk. And certainly find that the notice of discovery filed by the State in April lists two C.D.'s.

Further, Mr. Justice's testimony, while asserting to the Court he did not receive the second extraction, he acknowledged that his expert received the second extraction. He also acknowledged he had an additional disk that was not functional.

Concerning the first *Brady* factor, Defendant Watkins filed a discovery motion requesting the information. As for the second factor, we conclude that the State did not suppress the photographs. As the trial court noted, the State provided discovery to the defendants in April 2016 and filed, with the trial court, a notice of discovery along with the discovery prior to the October 2016 trial. By all accounts, the defense expert was given the second extraction on November 3, 2015, at Mr. Justice's instruction. A November 3, 2015 email from Mr. McWhirt, the defense expert, to Mr. Justice confirms the transfer of the extraction. Accordingly, the Defendant has failed to prove by a preponderance of the evidence that a *Brady* violation occurred. Defendant Watkins is not entitled to relief as to this issue.

## B. Courthouse Hallway Surveillance Footage
### 1. Newly Discovered Evidence

The defendants contend that the courthouse surveillance video footage showing the victim and the prosecutor talking while waiting for the elevator is newly discovered evidence entitling them to a new trial. At trial, before the lunch break, the trial court stated to the victim, "I would ask you not to talk to anyone who is outside of the courtroom about anything that you have heard or anything that was said inside the courtroom, especially if it's somebody that anticipates to be a witness in this trial."

After returning from the lunch break, the State conducted redirect examination. When it was time for recross examination, Defendant Watkins's attorney, Mr. Justice, asked the following questions:

JUSTICE:    [Victim], during the lunch hour that we took a couple of hours ago after you got done -- after I got done talking to you the last time, did anyone come up to you to talk about your testimony?

VICTIM:    No.

JUSTICE:    Did you talk to anyone at the D.A.'s Office?

VICTIM:    No.

JUSTICE:    Anyone from the D.A.'s Office?

VICTIM:     No.

Following the trial, Mr. Justice obtained courthouse surveillance video footage showing the victim, the State's two prosecutors, and a third woman standing at the elevator. The group stands at the elevator for just under two minutes before the elevator arrives. There is no audio portion to the recording.

As discussed above, a new trial on the basis of newly discovered evidence should be granted in cases where (1) the defendant has been reasonably diligent in obtaining evidence, (2) the materiality of the new evidence is apparent, and (3) the evidence is likely to change the result of the trial. *State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993). On appeal, our standard of review is abuse of discretion. *State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

In addition, when it appears that the newly discovered evidence "can have no other effect other than to 'discredit the testimony of a witness at the original trial, contradict a witness' statement or impeach a witness,'" the trial court generally should not order a new trial. *State v. Terrell Thomas*, No. E2003-02658-CCA-R3-CD, 2004 WL 2544682, at *7 (Tenn. Crim. App., at Knoxville, Nov. 10, 2004) (quoting *State v. Rogers*, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985)); *see also Caldwell*, 977 S.W.2d at 117. Only if the "impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal" should a new trial be ordered. *State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993) (citing *Rogers*, 703 S.W.2d at 169).

After review, we conclude that the victim's conversation with the assistant district attorney while waiting for the elevator is not material and would not likely change the outcome at trial. The evidence would be used for impeachment purposes. We cannot conclude that this impeaching evidence is so crucial to the defendants' guilt or innocence that its admission would probably result in an acquittal. Therefore, the trial court did not abuse its discretion in denying relief. The defendants are not entitled to relief as to this issue.

## 2. Failure to Correct False Testimony

In a related issue, the defendants contend that the State failed to correct the victim's false testimony that she did not speak with the prosecutors during the lunch break. The State responds that the defendants have failed to show that the victim's testimony was false.

In its ruling denying the motion, the trial court stated that his instruction, given before the lunch break, to the victim not to speak to anyone was based upon Tennessee Rule of Evidence 615, more commonly known as the rule of sequestration and, therefore, the victim did not violate this admonition by speaking with the State. Rule 615 of the Tennessee Rules of Evidence provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness.

The trial court further found that there had been no proof that the victim talked to the prosecutors about her testimony or "that any improper discussion happened outside the presence of the courtroom." The trial court found that the victim's testimony was "honest – or at least there's been no evidence that her testimony was dishonest when she said that she had not talked to anyone from the D.A.'s Office about her testimony during the break."

It is without question that the State may not present false testimony and that it has an affirmative duty to correct false testimony presented by State's witnesses. *State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). This affirmative duty applies regardless of whether the district attorney general solicited the false testimony. *Id*. at 618 (citing *United States v. Barham*, 595 F.2d 231, 232 (5th Cir.1979)). If the State fails to correct the witness's false testimony, then the defendant's due process rights are violated. *Id*. (citing *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). This affirmative duty also applies "when the false testimony is given in response to questions propounded by defense counsel for the purpose of impeaching the witness." *Id*. at 617 (citations omitted). In order to prevail on a claim that the State failed to correct false testimony, the defendant must prove the following by a preponderance of the evidence: "(a) that false or perjured testimony was admitted at trial, (b) that the state either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial." *Roger Morris Bell v. State*, No. 03C01-9210-CR-00364, 1995 WL 113420, at *8 (Tenn. Crim. App., at Knoxville, Mar. 15, 1995), *perm. to appeal denied* (Tenn. Aug. 28, 1995).

We conclude that the defendants failed to prove any of the aforementioned factors by a preponderance of the evidence. The victim was questioned as follows:

- 18 -

JUSTICE:    [Victim], during the lunch hour that we took a couple of hours ago after you got done -- after I got done talking to you the last time, did anyone come up to you to talk about your testimony?

VICTIM:    No.

JUSTICE:    Did you talk to anyone at the D.A.'s Office?

VICTIM:    No.

JUSTICE:    Anyone from the D.A.'s Office?

VICTIM:    No.

The trial court, who observed the exchange, understood Mr. Justice to be inquiring about whether the victim had spoken to anyone about her testimony. Whether the victim had spoken to the prosecutor about her testimony and received coaching that influenced her testimony at trial was the crux of Mr. Justice's concern and the motivation behind the question. He testified as such during the motion for new trial when he stated, "I just asked [the victim] whether she had talked with the State about the case during the lunch break at all. And I asked her effectively that question three times. And she denied it three times."

As Mr. Justice testified, the victim denied speaking to the prosecutor "about the case," and the defendants provided no proof that the victim and the prosecutor talked about the case during their conversation while waiting for the elevator. Therefore, there is no proof that the victim testified falsely at trial and that the State knew of this false testimony. Although not proof, as part of the record we note that the State, in its response to the motion for new trial, stated that there was no discussion regarding the victim's testimony; therefore, the prosecutor had nothing to correct. The video shows the victim talking with the two prosecutors and a third woman, but, with no audio, there is nothing to indicate that the discussion was improper. Accordingly, the defendants have failed to carry their burden of proof with regard to showing that the State failed to correct false testimony. The defendants are not entitled to relief on this issue.

### C. Improper Prosecutorial Argument

The defendants allege that the State made improper comments during closing argument. The State responds that the prosecutor's comments were in response to defense argument and none of the statements were so inflammatory as to deny the defendants due process.

Our supreme court has consistently opined on prosecutorial misconduct[1] regarding closing arguments as follows:

> The basic purpose of closing argument is to clarify the issues that must be resolved in a case. *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). While "argument of counsel is a valuable privilege that should not be unduly restricted," *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975), "such [ ] arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); *see also State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 DAVID L. RAYBIN, TENNESSEE PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 29 .2, at 97 (2008), leeway should be given regarding the style and substance of the argument. *Banks*, 271 S.W.3d at 131; *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." *Banks*, 271 S.W.3d at 131.

*State v. Sexton*, 368 S.W.3d 371, 418-19 (Tenn. 2012).

The court has also advised that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. *Banks*, 271 S.W.3d at 131 (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S .W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). "An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that if affected the outcome of the trial to the defendant's prejudice." *Id*. (citing *State v. Thacker*, 164 S.W.3d 208, 244 (Tenn. 2005); *State v. Cribbs*, 967 S.W.2d 773, 786 (Tenn. 1998)); *see also State v. Reid*, 164 S.W.3d 286, 321 (Tenn. 2005).

---

[1] This court has used the term "improper prosecutorial argument" instead of prosecutorial misconduct in addressing errors by the State during arguments to the jury because the use of the term "prosecutorial misconduct" alludes to a violation of the rules of professional conduct which govern the conduct of all Tennessee attorneys. *See State v. Weilacker*, No. M2016-00546-CCA-R3-CD, 2018 WL 5099779, at *6 (Tenn. Crim. App., at Nashville, Oct. 19, 2018). This court's opinions on legal issues involving jury trials do not include determinations on whether an attorney has violated a rule of professional conduct. Issues related to professional misconduct are not issues before this court on appeal.

As explained by our supreme court in *Sexton*, there are five general areas of potential prosecutorial misconduct related to closing argument:

> (1) It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw. (2) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant. (3) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. (4) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. (5) It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Sexton*, 368 S.W.3d at 419 (citing *Goltz*, 111 S.W.3d at 6 (citations omitted)); *see also* AMERICAN BAR ASSOCIATION, STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION §§ 5 .8-5.9 (1970).

The defendants assert that the State argued facts not in evidence when it stated that Defendant Dodson had deleted phone calls from his cell phone. At trial, Agent Christian testified that phone calls had been deleted from Defendant Dodson's telephone. There is nothing improper in the prosecution's argument that Defendant Dodson deleted phone calls from his phone. It is a reasonable inference that the owner of the phone is the person who deleted information from the phone. The evidence supports this contention.

Next, the defendants argue that the prosecutor improperly expressed personal belief or opinion. The State contends that the prosecutor's comments were in response to the defense argument that the victim's inconsistent statements rendered her a "liar." In so doing the prosecutor said, "And I would like to just make a little sidenote [sic] that if there was no D.N.A. in this case, who is to say the Defense wouldn't be, we weren't there." Both defense attorneys objected on the basis that it was "assuming facts not in evidence" and "ridiculous." The trial court allowed the State to "rephrase [the] statement." The State then said, "If there weren't D.N.A. in this case - - well, there is D.N.A. in this case. The Defendants can't really say they're not there." The defendants contend that this latter statement was a comment on the defendants' right to remain silent. We conclude that the State commented on the evidence, which included DNA evidence linking the Defendants physically, to the victim. In our view, this argument is not a comment on the defendants' right to remain silent.

The final challenge to the State's closing argument also comes from rebuttal closing argument.  Throughout the trial, the defense strategy was a sustained attack on the victim's credibility.   During closing argument, Mr. Justice accused the State of a "complete lack of concern for the truth."  He argued that the State had dragged Defendant Watkins "through the mud and humiliate[d] him in open court over four days."  About the victim, Mr. Justice stated, "This woman is a liar,"[2] and, "she can't stop telling lies." He accused Detective Roberts of "coaching" the victim and the State of "turn[ing] this courtroom into something of a joke."  During closing argument, both defense attorneys thoroughly reviewed all inconsistent and perceived inconsistent statements made by the victim at length.   In rebuttal, the State responded to defense counsel's argument as follows:

> Mr. Justice said that the State has made a joke out of this courtroom. There is nothing funny about what we have been doing here the last four days.  There is nothing funny about rape.  Thousands of women across this country do not report being raped.
>
> . . . .
>
> They do not report being raped for two reasons.  One, they are ashamed, and they blame themselves for what's happened to them.  And another is because they are afraid of what we have been doing for the last four days.  That people aren't going to believe them.  That they're going to be raked over the coals, and people are going to say it was their fault.  So, it's a wonder that anybody ever reports rape.
>
> . . . .
>
> So, [the defense] want[s] you to believe that [the victim] was having a grand old time on the night of the 21st into the morning of the 22nd, and she was getting it from two guys at the same time, and she likes it rough, and everything was great until she flipped the switch.  And she just decided that she wanted to make up some rape allegations. . . . That she's a liar.

The defendants contend that these statements were intended to inflame the passions of the jury, are facts outside the record, and injected issues broader than the guilt or innocence of the accused.  We agree with the State that the prosecutor was not making

---

[2] We would caution all attorneys to refrain from name-calling in closing argument.  Attorneys should address issues of credibility related to inconsistent statements or impeachment evidence professionally and in a manner that reflects the seriousness of the decisions the jury must decide.

a "community conscience argument" by "urg[ing] jurors to convict a criminal defendant in order to protect community values." *See State v. Pullman*, 950 S.W.2d 360, 368 (Tenn. Crim. App. 1996). The prosecutor's statements were a response to defense arguments attacking the victims' credibility by pointing out the difficulty a victim faces at a public trial.

The prosecutor's statements regarding the number of and reasons why victims of rape do not report, however, are facts outside the record. The prosecutor's assertion that "[t]housands" of women fail to report because they are ashamed and fear the legal process injected issues broader than guilt or innocence. In evaluating the impact of prosecutorial misconduct, we must consider the following factors:

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case.

(2) the curative measures undertaken by the court and the prosecution.

(3) the intent of the prosecutor in making the statement.

(4) the cumulative effect of the improper conduct and any other errors in the record.

(5) the relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Considering these factors and considering the comments in context, we conclude that the prosecutor's argument was improper and inflammatory. The number of women in the United States who fail to report rape and their reasons for doing so are clearly facts outside the record of this case, and the prosecutor's argument concerning these matters was clearly intended to evoke sympathy for the victim. No immediate curative measures were taken by the trial court or the prosecution. The jury instructions include a general provision that the arguments of counsel are not evidence and are to be disregarded if not supported by the evidence. We presume that the jurors follow their instructions. *State v. Young*, 196 S.W.3d at 111; *State v. Shaw*, 37 S.W.3d at 904. Perhaps the improper argument, standing alone, did not affect the results of the trial, but when considered along with other errors, it may call into question the reliability of the conviction. Our ultimate analysis regarding the effect of the improper argument, therefore, is deferred until the cumulative error section of this opinion

**D. Voir Dire**

- 23 -

Defendant Watkins and Defendant Dodson assert that the trial court erred when it made improper statements during voir dire. The State responds that because there was no contemporaneous objection, the defendants have failed to preserve the issue for appellate review. The failure to preserve issues for appeal generally results in a waiver. *See* Tenn. R. App. P. 36(a); *see also State v. Charles Wade Smith, III*, No. M2001-01740-CCA-R3-CD, 2003 WL 22116629 (Tenn. Crim. App., at Nashville, September 11, 2003), *no perm. app. filed*. By failing to make a contemporaneous objection to testimony, a defendant waives appellate consideration of the issue. *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). We note, however, that the issue was raised at the motion for new trial, and the trial court ruled on this issue; thus, the record is sufficient for our review.

During voir dire, prior to independent questioning related to potential jurors' personal experience with or exposure to sexual crimes, the trial court stated:

> Ladies and Gentlemen, this is a case that involves charges of aggravated rape and aggravated sexual battery. *Sexual assault and sexual crimes are a problem in our society.* People often find themselves entangled in one way or another.
>
> If there are any of you - - and I'm directing this initially to the 30 people sitting in front of me. If there are any of you who have had an experience in life related to a situation that involved sexual assault or rape or aggravated sexual battery, we want you to have the opportunity to explore that with Counsel to find out whether or not that would make you not competent because of some prior experience to sit on this panel.
>
> It may be you. It may be a family member. It may involve a false accusation or some other activity.

(Emphasis added).

Judges are prohibited from commenting upon the credibility of witnesses or upon the evidence in a case. *See* Tenn. Const. art. VI, § 9 (stating that "[t]he judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law"). Therefore, trial judges must be "very careful not to give the jury any impression as to his [or her] feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 407 (Tenn. 1989); *see also Kanbi v. Sousa*, 26 S.W.3d 495, 498-99 (Tenn. Ct. App. 2000). These restrictions apply to comments made when ruling on an objection. *Loeffler v. Kjellgren*, 884 S.W.2d 463, 474 (Tenn. Ct. App. 1994).

Even though judges need to be circumspect in this area, not every comment on the evidence made by a judge is grounds for a new trial. *Kanbi*, 26 S.W.3d at 499. We must consider the trial court's comment in the overall context of the case to determine whether the comment was prejudicial. *State v. Caughron*, 855 S.W.2d 526, 536-37 (Tenn. 1993).

In this case, the trial court did not comment on witness credibility or the evidence in the case. The trial court did, however, make an editorial comment on the prevalence of the type of crime at issue in this case and referenced sexual crimes as a "problem." The prevalence of sex crimes was not evidence and a fact that could have influenced the jury. We understand that the trial court's statement were intended to inform the jurors of the next phase of jury selection, which involved questioning regarding juror experience with or exposure to sexual crimes. Noting the prevalence of sexual crimes acknowledged the likelihood that this issue had impacted persons within the jury pool. It is likely the trial court was attempting to establish an atmosphere where jurors would disclose personal information that could reveal potential bias at trial; however, in our view, the better course is for trial courts to refrain from making generalized comments about the societal "problem[s]" caused by the type of offenses with which a defendant is charged. Accordingly, we conclude that the trial court erred in commenting on the prevalence of sex crimes to the jury; however, the error in isolation was harmless. *See Tenn. R. App. P. 36(b)*.

## E. Cross-examination of Victim with Prior Inconsistent Statements

The defendants argue that the trial court improperly allowed the victim to review her statements to Detective Roberts before cross-examination, violating the procedure provided in Tennessee Rule of Evidence 613. The defendants contend that their "fundamental right to confront and effectively cross-examine the witness against him was taken away by the trial court's ruling."

Before cross-examination of the victim, the trial court and trial attorneys engaged in a lengthy discussion about the procedure for examining the victim about inconsistent statements. Mr. Justice stated that he had an audio disc containing thirty-six audio clips of statements he wanted to question the victim about. The trial court advised Mr. Justice that if he asked the victim "about a prior inconsistent statement, and she denies making a prior inconsistent statement and you wish to enter that statement, I'm not going to allow you to enter the statement unless she's had the opportunity to review it and a chance to explain her answer." Mr. Justice questioned the procedure, and the trial court remained firm that Mr. Justice should question the victim on the inconsistent statement and then if she denied making the statement, he would be required to give her the opportunity to refresh her memory. Mr. Justice then asked several questions that appear to question

whether the procedure would be too cumbersome with audio and the following exchange occurred:

| | |
|---|---|
| Trial Court: | We'll have to take a break and let you play that clip for her. |
| Mr. Justice: | Okay. So, maybe we should do that right now, I guess is what I'm saying. |
| Trial Court: | That's what I asked. |
| Mr. Justice: | Okay. |
| Trial Court: | Do you want to show her all these statements and let her have the opportunity to refresh her memory with it? |
| Mr. Justice: | I don't have any problem with doing that. |
| Trial Court: | Okay. |

It appears that the trial court did not "order" this procedure but that the parties came to an agreement about how best to efficiently cross-examine the victim about alleged inconsistent statements using audio clips. The trial court correctly outlined the proper procedure for impeachment of a witness with a prior inconsistent statement. Mr. Justice expressed concern about the cumbersome nature of stopping to listen to audio and suggested that the victim listen to the audio "right now" before the jury returned. The trial court asked Mr. Justice if that is how he wanted to proceed, and Mr. Justice did not "have any problem with doing that."

Rule 36(a) states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." The Advisory Comments clarify that "[t]he last sentence of this rule is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." Tenn. R. App. P. 36(a), *Advisory Comm'n Comments*. Generally, a party to a lawsuit cannot complain of an error if he created the situation. *Waters v. Coker*, 229 S.W.3d 682, 689-90 (Tenn. 2007). Accordingly, the defendants are not entitled to relief on this issue.

- 26 -

Even so, we note that in *State v. Martin*, the Court explained the rationale for Rule 613:

> Confronting a witness prior to the introduction of extrinsic evidence provides for an orderly presentation of evidence and testimony. Time is saved if the witness unequivocally admits to having made the prior statement. Moreover, confronting a witness with an inconsistency prior to the introduction of the extrinsic evidence lessens the risk that a jury will consider the evidence as substantive evidence.

964 S.W.2d 564, 567 (Tenn. 1998). Although the procedure used here is different than the procedure provided in Rule 613, the procedure agreed upon by the parties addressed the purpose and intent of Rule 613 by preserving the interests of efficiency and orderly presentation.

### F. Failure to Compel Deposition

The defendants assert that the trial court erred when it did not order a deposition of the victim. The State responds that the trial court properly declined to order a deposition of the victim.

It appears from the record that the victim was subpoenaed to testify at an April 28, 2017 motion for new trial hearing. The State was initially unaware of the purpose for the subpoena but, believing the defense intended to question the victim about her conversation at trial with the prosecutors in the hallway while waiting for the elevator, the State agreed to a deposition of the victim. The trial court issued an order on April 28, 2017, scheduling the agreed upon deposition of the victim for May 19, 2017, and the motion for new trial hearing on June 21, 2017. The State's May 9, 2017 motion to limit the victim's deposition testimony indicates that the victim "plann[ed]" to move in June.[3] In light of the victim's move, the State agreed to the deposition "to assist the defense with avoiding issues related to [the victim]'s travel plans." After discussion with the defense, the State learned that the defense intended to cross-examine the victim more broadly than the issue of her interaction with the prosecutors in the hallway. In its motion, the State asserted that the victim had already undergone the "rigorous ordeal" of questioning at trial and, therefore, the trial court should limit the questioning. The trial court declined to order a deposition of the victim absent an agreement between the parties. The motion for new trial hearing was set for June 21, 2017, and ultimately was held on July 24, 2017.

---

[3] The briefs in this case, although not evidence, indicate that the victim intended to move to Maine.

- 27 -

The record includes a served subpoena for the victim's appearance at the April 28, 2017 motion for new trial hearing. That hearing was subsequently rescheduled. Additionally, there are three unserved subpoenas for the victim's appearance for May 19, 2017, June 2, 2017, and June 21, 2017. The appellate record contains no subpoenas, served or unserved, for the victim for the date the motion for new trial was actually heard on July 24, 2017.

The State asserts that the defendants have waived review of this issue for failure to include it in their motions for new trial. Grounds not raised in a motion for new trial are waived for purposes of appeal. *See Waters*, 229 S.W.3d at 689 (citing *Boyd v. Hicks*, 774 S.W.2d 622, 625 (Tenn. Ct. App. 1989)). In a motion for new trial, the defendant must set forth the factual grounds on which he relies, the legal grounds for the trial court's ruling, and a concise statement as to why the trial court's decision was in error. *State v. Lowe-Kelley*, 380 S.W.3d 30, 33-34 (Tenn. 2012) (quoting *State v. Hatcher*, 310 S.W.3d 788, 802 (Tenn. 2010) (internal quotation marks omitted)). The contents of the motion should direct the attention of the trial court and prevailing party to the asserted error, and the movant should specify the issues with sufficient certainty to enable the appellate court to determine whether the issue was first raised in the trial court. *Waters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007) (citing *State v. Gauldin*, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987)).

Defendant Watkins responds that, because the victim's testimony related to the issues at the motion for new trial, he is not required to include the issue in his motion. We disagree. Raising an issue in a motion for new trial allows the trial court to consider or reconsider the issue and make an appropriate ruling. *Fahey v. Eldridge*, 46 S.W.3d 138, 142 (Tenn. 2001) (quoting *McCormic v. Smith*, 659 S.W.2d 804, 806 (Tenn. 1983)). In this case, the trial court was deprived of the opportunity to address this alleged error, leaving this court with nothing to review. The purposes behind requiring that issues for review be contained in the motion for new trial are still present. The defendants were aware that the trial court declined to order the deposition on May 17, 2017, well in advance of the motion for new trial hearing, providing sufficient time to amend the motion and the opportunity for the trial court to reconsider the issue.

Waiver notwithstanding, the defendants are not entitled to relief. The decision whether to grant or deny a motion to take the deposition of a proposed witness for use at a criminal trial is committed to the discretion of the trial court and should be exercised carefully. *United States v. Mann*, 590 F.2d 361, 365 (1st Cir.1978); *see also United States v. Campbell*, 845 F.2d 1374, 1378 (6th Cir.1988) (applying an abuse of discretion standard of review to trial court's determination of exceptional circumstances in support of video deposition). Tennessee Rule of Criminal Procedure 15(a) states that "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial"

and that the trial court may "grant the motion because of exceptional circumstances and in the interest of justice [.]" Tenn. R. Crim. P. 15(a).

The rule does not define "exceptional circumstances." Our supreme court has deemed a witness's military service "exceptional circumstances," and the resulting unavailability justification for the taking of the witness's deposition and its later use at trial. *State v. Simon*, 635 S.W.2d 498, 504 (Tenn. 1982). A witness's medical condition has also been deemed "exceptional circumstances" under Rule 15. *State v. Powers*, 101 S.W.3d 383, 398 (Tenn. 2003). This court has expressed doubt that a witness's vacation plans, *see State v. Coulter*, 67 S.W.3d 3, 59 (Tenn. Crim. App. 2001), or a witness's impending relocation to Saudi Arabia, *see State v. Jeffrey Scott Gold*, No. E2012-00387-CCA-R3-CD, 2013 WL 4278760 (Tenn. Crim. App., at Knoxville, Aug. 15, 2013), *no perm. app. filed*, qualified as "exceptional circumstances" under the terms of the rule. Other cases, although not addressing the propriety of the taking of a deposition, have noted that depositions were taken to preserve the testimony of a witness incarcerated in another state, *see State v. Marlo Davis*, No. W2011-01548-CCA-R3-CD, 2013 WL 2297131, (Tenn. Crim. App., Jackson, at Jackson, May 21, 2013), *perm. app. granted* (May 21, 2013), and a witness suffering from end stage lung cancer, *see State v. Justin Brian Conrad*, No. M2008-01342-CCA-R3-CD, 2009 WL 3103776 (Tenn. Crim. App., at Nashville, Sept. 29, 2009), *perm. app. denied* (Tenn. Feb. 22, 2010).

In our view, the defense has not shown that "exceptional circumstances" warranted the victim's deposition in this case. There is no evidence in the record that the victim in fact moved or that she would refuse to return for the hearing. Moreover, it does not appear that a subpoena was issued for the victim for the day of the motion for new trial hearing. The record is silent as to the victim's location at the time of the hearing, any efforts to secure the victim's presence at the July 24 hearing, or the victim's ability to attend the hearing. Having reviewed the record, other than the assertion that the victim "plan[ned] to move," we find no evidence of any exceptional circumstances. This issue is therefore without merit.

## G. Premature Jury Instruction

The defendants argue that the trial court erred by giving preliminary jury instructions prior to the jury panel being sworn. The State responds that the defendants cannot show any prejudice from the trial court's procedure.

Following the voir dire phase of jury selection and while the attorneys were considering peremptory challenges, the trial court addressed the attorneys and then the jury about the next phase of jury selection, as follows:

Counsel, at this time now you may challenge the jury. Ladies and Gentlemen, this is the process where the attorneys go through making their best estimates on who would be the best jurors for this case.

As they go through that process, I'm going to begin reading the preliminary jury instructions, because I don't want us to be sitting here not doing something that we could do to help things move along to try to make efficient use of your time.

No objections were raised as to this procedure. The trial court then began reviewing preliminary instructions, which continued as challenges were exercised by the State and the defendants. When the trial court finished the preliminary instructions, he discussed breaks during the trial and the availability of coffee, water, and "snacks." The trial court then explained the structure of the Tennessee court system until the selection process was completed.

Tennessee Rule of Criminal Procedure Rule 30(d) states,

(d) TIMING OF JURY INSTRUCTIONS.

(1) AT BEGINNING OF TRIAL. - *Immediately after the jury is sworn*, the court shall instruct the jury concerning its duties, its conduct, the order of proceedings, the general nature of the case, and the elementary legal principles that will govern the proceeding.

(2) BEFORE AND AFTER CLOSING ARGUMENT.- Jury instructions on the applicable law may be given before or after closing argument, in the court's discretion. All or part of such instructions given before closing argument may be repeated after closing argument. Additional instructions concerning organizational and related matters also may be given after closing argument.

(emphasis added). This version of the rule took effect on July 1, 2003 and provided greater discretion to trial courts regarding when instructions on the applicable law may be given to the jury. The prior version required that the jury be instructed after the completion of closing arguments.

While the current version provides the trial courts with greater discretion regarding the timing of jury instructions, trial courts should refrain from instructing the jury before the panel is selected and sworn, consistent with Rule 30. We agree with the defendants that the reasoning governing the timing of jury instructions includes ensuring

that those jurors selected to hear a case are focused on the instructions being given. We point out also that Counsel, as a practical matter, cannot discuss and exercise preemptory challenges while also listening to and focusing on the instructions being given. Nonetheless, we conclude that the error in the trial court instructing the jury before it was empaneled is harmless. The instructions given to the jury were correct and adequate, the jury was given a complete copy of the written instructions at the conclusion of the trial, the trial court instructed the jury "[e]qual weight is to be given to all instructions regardless of when they were presented to you," and there was no evidence that the timing of the preliminary instructions affected the outcome of the trial.

## H. Juror Note During Deliberations

The Defendants assert that the trial court improperly addressed a jury note it received during deliberations. During deliberations, the jury sent a note to the trial court requesting: "Can we get the transcripts of [the victim]'s testimony?" The trial court responded with a note that stated: "Please refer to page 9." This trial court's note refers to page 9 of the jury instructions which state, "The Court will not provide you with a transcript of the testimony at the end of the trial. Therefore, you must listen very carefully to the testimony." Neither the State's attorney nor the Defendants' attorneys were notified of the jury's question at the time the trial court received it, nor were any of the attorneys notified of the trial court's response to the jury question at the time the trial court's response was made.

At the motion for new trial hearing, the trial court made the following findings as to this issue:

> During the jury deliberation, the jurors submitted a question asking if they could review a portion of the victim's testimony. The Court received the question, and replied to them to review Page 9 of the jury instructions, . . . that states at the close of this trial, you will not be given a transcript of the evidence. And, therefore, you must pay close attention and take good notes.
>
> They were allowed to take notes. The jurors took good notes. Even in a lengthy trial, it was the Court's impression, based on its observations, that the jury paid close attention to all the testimony during the trial.
>
> The Court . . . determined that it would be inappropriate to play a portion of any person's testimony, whether they were a witness for the State or a witness for the Defense. The Court did not want to overly emphasize one particular area of testimony over any of the other testimony

that was presented. And, so, the Court answered the question in conformance with what it had previously advised the jury, and which was part of the jury instruction.

In *State v. Jenkins*, 845 S.W.2d 787, 793 (Tenn. Crim. App. 1992), a panel of this court held that the decision as to whether a jury should be allowed to review trial testimony is within the discretion of the trial court. In doing so, the court noted that

[j]uries apply emphasis to evidence which is before them. Obviously, if they are allowed to rehear particular testimony at their request, there is benefit to be gained in assisting the jurors to decide issues based upon an accurate recollection of the evidence.

*Id.* at 792. The court adopted Standard 15-4.2 of the ABA Standards Relating to the Administration of Criminal Justice as the standard to be applied by a trial court responding to a jury's requests to rehear trial testimony:

(a) If the jury, after retiring for deliberation, requests a review of certain testimony or other evidence, they <u>shall</u> be conducted to the courtroom. Whenever the jury's request is reasonable, the court, after notice to the prosecutor and counsel for the defense, shall have the requested parts of the testimony read to the jury and shall permit the jury to reexamine the requested materials admitted into evidence.

(b) The court need not submit evidence to the jury for review beyond that specifically requested by the jury, but in its discretion the court may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.

*Id.* at 792 (emphasis added). Under this standard, the trial court has the discretion to take such action as is necessary, including denying the jury's request, to insure that the jury's determination of an actual issue would not be distorted by undue emphasis on particular evidence. Thus, our standard of review is abuse of discretion. *Id.* at 793.

The defendants state in their briefs that "[t]here is no question it is within the trial court's discretion whether to permit the jury to reexamine evidence." Instead, they argue that the trial court failed to follow the proper procedure, "to <u>first</u> bring the jury back into the courtroom and <u>give notice</u> to the parties." They then argue that "the jury should have been permitted to reexamine the victim's testimony as requested."

To the extent that the defendants challenge the trial court's decision to not submit the transcript to the jury, we cannot conclude that the trial court abused its discretion. A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The trial court considered the requests and determined that it was best not to place undue emphasis on any particular testimony in accordance with the ABA Standards. The jury was provided with the opportunity to take notes during the trial, and the trial court observed the jury and believed the jury to have been observant and paying attention throughout the trial. It was within the trial court's discretion whether to permit the jury to hear/see the victim's testimony again, and based upon the trial court's reasoning for declining the request, we cannot conclude that it was an abuse of discretion.

As to the trial court's procedure in responding to the jury question, we conclude that the trial court did not follow the procedure adopted in *Jenkins*. The trial court failed to have the jury return to the courtroom and failed to notify the parties of the jury's submitted question. The jury deliberations are a critical part of the proceedings. The defense and the State are entitled to notification of a jury question during deliberations, and the opportunity to be heard as to the trial court's proposed response to the jury. The testimony of the victim in this case and in particular her credibility, was clearly crucial to all parties. In our view, a "boiler-plate" instruction to the jury, that there will be no chance to review testimony during deliberations, should not be used in the manner that the trial court did here. The jury felt strongly enough to send the note asking to review the victim's testimony even though they had been given "page 9" prohibiting it. Therefore, we conclude that the errors in the procedure followed by the trial court would be harmless in isolation, but will be considered as part of our cumulative error review.

## I. Improper Jury Instruction

The defendants argue that the trial court improperly included recklessness as a mental state in the jury charge. Additionally, Defendant Dodson argues that the indictment failed to give him adequate notice of rape by reckless conduct. The State responds that the trial court properly instructed the jury on reckless conduct.

The indictment charged the defendants with "unlawfully and knowingly" committing aggravated rape and aggravated sexual battery. The offenses were charged in

the alternative, with the aggravating factor being either "bodily injury" or aided or abetted by another person with force or coercion to accomplish the act.

Our supreme court has noted that the aggravated rape statute neither expressly requires nor plainly dispenses with the requirement for a culpable mental state. *Crittenden v. State*, 978 S.W.2d 929, 930 (Tenn. 1998). Consequently, "intent, knowledge, or recklessness" suffices to establish the necessary culpable mental state. *Id.*; T.C.A. § 39-11-301(c)(2014).

The defendants contend that because they were indicted for having "unlawfully and knowingly" committed the offenses, the jury should not have been charged that the offense could have been committed recklessly. However, "in the hierarchy established by the legislature, 'recklessness' is a lesser level of mental state that is embraced by both 'intentional' and 'knowing.'" *State v. Crowe*, 914 S.W.2d 933, 937 (Tenn. Crim. App. 1995). This means that the State "cannot prove that an offense was committed '[knowingly]' without proving that it was committed 'recklessly.'" *Id.* When an indictment charges that a crime has been committed intentionally "the defendant is on notice that ['knowing' and] 'recklessness' [are] contained within the statutory definition." *Id.* As such, "a jury instruction containing the mental element[s] of ['knowing' and] 'reckless' is certainly not erroneous." *Id.* Accordingly, we conclude that this issue is without merit.

As to Defendant Dodson's argument that the indictment failed to give him adequate notice, each of the indictments cited the relevant statute. According to the United States Constitution and the Tennessee Constitution, an indictment must provide the accused with "the nature and cause of the accusation" being made against him or her. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. This Court has held that reference to the applicable statute "within the indictment may be sufficient to place the accused on notice of the charged offense." *State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000). In other words, citing the statute in the indictment provides the defendant with notice regarding the *mens rea* of the offense, gives notice regarding the offense upon which to enter judgment, and protects against future prosecution for the same offense. *See State v. Carter*, 988 S.W.2d 145, 149 (Tenn. 1999); *Ruff v. State*, 978 S.W.2d 95 (Tenn. 1998). Accordingly, we conclude that the indictment provided sufficient notice to Defendant Dodson.

### J. Cumulative Error

The defendants contend that the cumulative errors by the trial court constitute reversible error. Our supreme court has stated:

The United States Constitution protects a criminal defendant's right to a fair trial; it does not guarantee him or her a perfect trial. We have reached the same conclusion with regard to the Constitution of Tennessee. It is the protection of the right to a fair trial that drives the existence of and application of the cumulative error doctrine in the context of criminal proceedings. However, circumstances warranting the application of the cumulative error doctrine to reverse a conviction or sentence remain rare.

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.

*State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (citations omitted). In our review of this case, we have found four errors: (1) improper prosecutorial argument, (2) an improper comment by the trial court during voir dire about the prevalence of the type of offense for which the defendants were tried, (3) preliminary jury instructions given before the jury was empaneled and in violation of Tennessee Rule of Criminal Procedure 30(d), and (4) the failure by the trial court to follow the *State v. Jenkins* procedure regarding a jury note during deliberations. We concluded that in isolation, each of these errors was harmless. However, when considered together within the context of the entire proceeding, we conclude that the errors affect the reliability of the convictions and denied the defendants a fair trial.

### K. Sufficiency of the Evidence

The defendants assert that the evidence is insufficient to support their convictions "[g]iven the inconsistencies in the [victim]'s testimony." The defendants assert that the trial court erred when it did not grant a new trial because the "jury verdict was against the weight of the evidence." The State responds that the evidence is sufficient to sustain the defendants' convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon

direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence

was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

On appeal, the defendants do not challenge with any particularity the State's proof of any of the elements of any of the crimes for which they were convicted. Instead, the gist of the argument made by both defendants is that the victim was not an entirely credible witness. This court is not arbiter of the credibility of witnesses or the weight to be given to their testimony. *See e.g., Wagner*, 382 S.W.3d at 297 (quoting *Campbell*, 245 S.W.3d at 335). In fact, even "numerous inconsistencies" in testimony do not serve to undermine a jury's verdict on appeal. *State v. Joseph Cordell Brewer*, III, No. W2014-01347-CCA-R3-CD, 2015 WL 4060103, at *5 (Tenn. Crim. App., at Jackson, June 1, 2015), *no perm. app. filed*; *State v. David Dwayne Smith*, No. E2007-00084-CCA-R3-CD, 2009 WL 230696 (Tenn. Crim. App., at Jackson, Feb. 2, 2009), *perm. app. denied* (Tenn. Aug. 17, 2009); *see also, State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) ("[A]lthough inconsistencies or inaccuracies may make the witness a less credible witness, the jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt.").

In this case, the inconsistencies in the victim's testimony were not such as to create a reasonable doubt as to the defendants' guilt. Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the defendants guilty beyond a reasonable doubt of rape, aggravated rape, and sexual battery.

To the extent that the defendants are challenging the trial court's approval of the verdict in its role as thirteenth jury, the record shows that the trial judge properly discharged its duty as thirteenth juror and, as stated above, that there was sufficient evidence to support the trial court's approval of the verdict. The defendants are not entitled to relief as to this issue.

### L. Sentencing

Defendant Watkins challenges the trial court's sentence, claiming that his twenty-year sentence is excessive. Specifically, he argues that the trial court erred by preventing him from introducing impeachment evidence related to the victim's impact statement and improper application of enhancement and mitigating factors.

Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of

the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708. We are also to recognize that the defendant bears "the burden of showing that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

At the sentencing hearing, Mr. Justice asked Mrs. Watkins, Defendant Watkins' wife, if she had reviewed the victim impact statement. She responded, "Yes." He then asked if Mrs. Watkins had "tr[ied] to perform any investigation in this case about [the victim]'s background online?" Mrs. Watkins responded, "Of course, I mean –" The State then objected on the basis of relevance. Mr. Justice argued it was "for impeachment under Rule 613," and the trial court sustained the objection. Mr. Justice submitted the "internet postings" as Exhibit A for identification purposes only but made no offer of proof. On appeal, Defendant Watkins asserts that the trial court erred when it sustained the State's objection to relevance.

Exhibit A consists of postings from the victim's Facebook account. Defendant Watkins does not identify, either at the hearing or in his brief, which postings should have been admitted as impeachment evidence. Furthermore, he does not specify which statements in the victim impact statement he was seeking to impeach through

introduction of the Facebook postings. Thus, we conclude that the Defendant has not carried his burden of showing the sentence is improper.

Next, Defendant Watkins argues that the trial court misapplied enhancement factor (7), that the offense involved a victim and was committed to gratify the defendant's desire for pleasure and excitement. T.C.A. § 40-35-114. Defendant Watkins asserts that the State failed to demonstrate that the offense was committed for pleasure or excitement. He further asserts that the trial court erred by failing to apply mitigating factor (1), that the defendant's criminal conduct neither caused nor threatened serious bodily injury and mitigating factor (10), that the Defendant assisted authorities in locating a person involved in the crime. T.C.A. § 40-35-113.

The trial court found that Defendant Watkins was the leader in the commission of an offense involving two or more actors, Tennessee Code Annotated section 40-35-114 (2), and gave slight consideration to the enhancement factor that the rape was committed for pleasure or excitement, Tennessee Code Annotated section 40-35-114(7). The trial court also considered mitigating factors but found that none applied. We note that the misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Bise*, at 708. A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id*. at 707. So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

We conclude that the trial court properly sentenced Defendant Watkins. The trial court considered the relevant principles and sentenced Defendant Watkins to a within range sentence. The evidence supports the trial court's application of enhancement factor (7), that the rape was committed for pleasure or excitement, but the trial court only gave slight weight to this factor. The trial court applied and it gave weight to enhancement factor (2), that Defendant Watkins was the leader in the commission of the offense, which Defendant Watkins does not contest. Even if the trial court misapplied enhancement factor (7), the misapplication of a single enhancement factor does not void Defendant Watkins's sentence. *See Bise,* at 708. Further, there was ample evidence supporting the application of the additional enhancement factor. We similarly conclude that, based on the evidence and applicable sentencing principles, Defendant Watkins's within-range sentence is not excessive. As such, the Defendant is not entitled to relief on this issue.

### III.   Conclusion

For the reasons stated in this opinion, the judgments of the trial court are REVERSED, and the case is REMANDED for a new trial.

_____
ROBERT W. WEDEMEYER, JUDGE